Case 17-3400 Catherine Castor versus AT&T Umbrella Benefit Plan number three oral argument 15 minutes per side. Mr. McDonald for the appellant. May it please the court. My name is Joseph McDonald. I represent Catherine Castor. We are here today appealing a decision of the Southern District of Ohio which found that Ms. Castor was not entitled to her short-term disability benefits. The remedy that we seek today is a vacation of the district court's ruling and instruction to send this case back to the plan administrator where it belongs to correct very serious procedural deficits. The remedy that I seek has tailored what I'm going to say to you today. And so as a starting point, it occurs to me what is worse? Is it worse when a plan administrator violates clearly established law as it works towards the regulations that support the employee benefit structure or is it worse when they read the plan but do something completely contrary? And after giving this some thought and as serious as a violation of the law is, I believe that the more serious problem is having the plan in front of them but simply doing something different. It represents a betrayal at least of what is agreed upon. Plan terms in the long history of this court have been given one thing and one thing only, plain literal meaning. All the way back to University Hospital versus Emerson, it's clear. We don't give a fancy read to these words. They are what they are. And in that vein... What if a plan violation is truly a de minimis matter? If it's truly a de minimis, I don't know how it could be. If the plan reads a certain way and you engage in a behavior that is not, you know, is not equal to what is called for, I don't know how that could ever be de minimis. Now, I suppose you could eventually rationalize that perhaps this didn't affect the thing, but all in all, the analysis that the plan administrator is providing is not consistent with the promises that are made to who? The beneficiaries. And what specifically are you talking about? Because I'm getting lost in the abstract. So, in the abstract, let's move to the concrete here. This plan requires that you analyze the disability against job duties. Now, it doesn't say occupation. It doesn't say occupation performed internationally. They say in their brief that you agreed that the sedentary work, that your client agreed, and they point to specific pages in the record. And in those pages in the record, it says, and I'm thinking of like one in six, it says that it alleges your client agreed that it was sit-talk type or sedentary work. Judge Tapar, you raised a very good point. It was the next point I was going to get to. In their brief, they do say that. That Ms. Castor agrees that we were going, that she agreed to the phrase sit-talk type. Now, my problem with that is very singular. Ms. Castor is, A, home. She's home with pneumonia, with C. diff, and she's just days away. Did she agree to it? She agreed to that, but that is not consistent with the plan. The plan calls for job duties, not abstract sit-talk type words. Well, but, okay, so that's a fair point. But then in, I think it's Rader's, right, report, he says job duties, and then he describes specifically, he takes it right out of the plan, the language, when he talks about the job description. And what the case law says is they have to consider it. So why isn't that sufficient, especially under an arbitrary and capricious review? Well, under an arbitrary and capricious standard, you have to demonstrate that there's a logical connection between what is required under the plan and your behavior. So your question is very fine, and the answer is it's not good enough because it doesn't really embrace all of the duties of the job. If you look at the job description. What about the job, maybe this is where you're going. What about the job description doesn't describe sedentary work? The job description describes an intense environment of sales. That's what it describes. It describes technical knowledge. It describes persuasion. It describes getting customers to buy things. That's what it describes. But in this case, that is sedentary work, I would imagine, under the rule. As we use that word, and again, the plan doesn't use that word. That is a word that is frequently used by us, but that is not a word used by the plan, job duties. Yes, that's right. But her job duties could be summarized as involving sedentary work, correct? Job duties, no. No, sedentary work. She doesn't have to lift. She doesn't have to be on her feet. All of that is conceded. Sedentary describes a demand level. If we're going to be technical about it, the dictionary of occupation... Describes what? What's that? I'm sorry, it describes what? A demand level. So in the dictionary of occupational titles, there are heavy, medium, light, and sedentary. And this is where the word comes from in its common use. So in sedentary work, you sit for six hours, you stand for one, walk for one. You don't lift more than 10 pounds regularly. So you analogize it to, Judge, in your reply brief, but it sounds pretty similar. I think we do sedentary work. I think that you would be classified as the highest skilled sedentary worker that is. But clearly... Highly skilled is debatable. But your point is that her job description, which has, as I recall, 20 different items, is much more fine-tuned than just sitting for six hours a day. And that any person who's seeking disability leave should have the fine points of the job evaluated to see whether that person could meet the requirements, as opposed to, golly gee, you just sit for six hours a day. Right, and I completely agree. And at this point, I think that it's worthwhile to point out just briefly, this case starts as a disability in February of 14. The denial occurs, the first denial occurs in December of 14. And you don't even have AT&T, have a minimal understanding of the job duties until July of 15. Whose burden was it to show the job description to the reviewers? It's absolutely the plan to give it to the reviewers. And it's absolutely the plan to acquire it long before they're going to deny that claim in the first place. Sedgwick should have gotten it from the plaintiff, or should Sedgwick have gotten it from the employer? Should have gotten it from the employer on day one. It's their responsibility to analyze the job duties. And I think, to judge the parse point, I don't think it's good enough that Ms. Caster can agree to it. I mean, ultimately, if that were okay, then we'd be basically engaging in a waiver of the plan terms, right? When did she back off from saying, okay, it's sit, talk, type, or sit, talk, type? Sit, talk, type. I mixed that up, too. I can't recall, to be honest. I can't recall. But it's clear the job had more, even Sedgwick in their analysis didn't give it a sales function until July of 15. Hold on. She, the first time I saw her back off of it, and you should correct me if I'm wrong, because you know the record much better than me, is in the district court. So, because I didn't see it in your appeal letter that she was alleging, you tell me if I'm wrong, though. I'm happy to look at it. And so, if that's the case, it's hard to allege, especially where what he says is, and I'm reading from his report, job description for a service representative includes ability to assist customers with order, billing, and or collection related issues. And he takes that right out of the general duties from a service representative. The only physician to do so was the physician you're referring to, Dr. Rader. So, even if we look to Dr. Perez, what does he conclude? I can't tell anything from this. What does Dr. Conrad conclude? Perez and Conrad, correct me if I'm wrong, Perez and Conrad were looking not at her mental health issues as much. Perez was internal medicine, and Conrad was a cardiologist. And what Conrad concluded in the initial review was that she was not suffering from significant cardiac issues, such that she couldn't return to work. And even Goyle, her own doctor, said she could return in February. And when he alleges he reached out to him, and Goyle called back and talked to his partner, Goyle agreed, according to Conrad, that she could come back in December. Even in Dr. Conrad's opinion, I guess what I would have you, you're correct in all of it, except Dr. Conrad, even in the end of his first report, which you have read, says this is an unstable environment here, and she could relapse, and I'm not entirely sure exactly, I'm not quoting here, please, but he is not clear entirely about giving her a clean bill of health. The only thing that's really happening in Dr. Conrad's report, which is the next thing I was going to get to anyway, was largely, Dr. Conrad, it's an unexplainable kind of event. You reach a left ventricle ejection fraction of 40, and magically you're okay. Now that is a good sign for Ms. Castor, thank God. But what about the remainder of the symptoms that they were paying her for, right? This is not just a heart problem, this is fatigue, this is shortness of breath, this is weakness, this is a lot of things that she's experiencing, and this I think gets... Your appeal letter doesn't focus on any of those issues. My appeal letter focuses on the inexplainability of the fact that Sedgwick can call 70% normal, and somehow 40% is good enough to work, and the documents that I supplied to Mr. Matheson in the appeal, and I can provide you with the citation, 683, definitely in January of 15 reflect exactly what Dr. Conrad was suggesting, that she is relapsing, that she isn't good enough to go back. So 683 is a vitally important document. Why didn't you on appeal get an affidavit from Goyle saying she wasn't good enough to go back? Because apparently he said she was good enough to go back. Well, even Goyle, as you point out, originally said February of 15 would be her return date. And then I would encourage you, the documentation that was provided, I might have not complained about it in my appeal letter, but most certainly, again, I would go to 683 again and take a look at that. You're talking about Goyle's report? Yes. But isn't that his prior report? In other words, is there something in between? Yes. From the denial to my time is up, Judge. That's all right. Can he answer? Thank you. Would you like me to continue? Yes, please. So from the time the denial, when Dr. Conrad wrote the original report in November and the denial comes out in December, in January, 683 represents that Ms. Castor is still deteriorating. No, no, no. So tell me if I'm wrong. Can I ask another question? Okay. Here's where you should definitely correct me. So you could be, right, able to work in suffering from health issues, correct? I mean, people suffer from health issues in work, and I'm not. This is a significant health issue. There are people who have mild conditions that allow for the work that they do, given what the work they do allows them. Right. So my point is, is Goyle apparently told, I think it's Sunderman, but I can't remember the name, but told the partner of Conrad that she was fine to go back. Yes. There's nothing... Well, no, no. Go ahead. I'm sorry. No. So this is a very important point. I've got to remember, at that point, when that conversation occurs between some other doctor and Dr. Goyle, there still is no clear understanding of what her job duties are. They don't have a job description until this summer. So that is a really valid point. Go ahead. I'm sorry. But you never allege anywhere, not even in your appeal letter, that her job is stressful and therefore you talk about the mental health issues, but you don't say her job is stressful and therefore her heart can't handle it. I don't see that claim made anywhere, so I don't know why the doctors on appeal would evaluate that. Even Dr. Conrad, when the appeal was there, he actually got a hold of 683, which says that Ms. Caster is deteriorating, that she has to go back on disability or may have to go back on disability if we can't figure out what's wrong with her. So I may not have made the most pronounced opinion in my appeal letter, Judge Larson, but the documents I provided certainly... Is it their job to construct your argument? Can it ever be arbitrary and capricious if you don't put it in your appeal letter? No. Go ahead. You raise a very important point, and in this plan it doesn't matter. There are plans out there that say if you do not raise an argument in your appeal, then it is eliminated. But even on DeNovo, even on if you did it in court, if you don't raise an argument, you're saying they have to review everything and speculate what your position is and then determine if you can do the job? Well, I think that they have a duty to review the evidence, don't they? And if the evidence says that she probably is going to have to go back on disability, is that something you can just sweep under the rug? I don't think so. Thank you. Thank you. May it please the Court. My name is Eric Matheson. I represent the appellee here, the AT&T Umbrella Plan No. 3. And I'd like to pick up with some of the comments and questions that were raised during Mr. McDonald's state opening. Your Honors are exactly correct that the ERISA has an administrative review process, during which if there are disagreements, if there's additional information that the plan administrator is to review, those issues are supposed to be brought up on appeal. Here, Ms. Castor and her counsel used almost the entire 180 days, maybe even a little more, or six months, to assemble all of the information, to submit it to SEDGWC, and by that time they had the entire claim file that existed up to that point. So they knew, just like the Court has now, what existed at that time. They had the claim notes that classified Ms. Castor's job as sit-talk type that she told SEDGWC about. They had the doctor's report that indicated the analysis that he went through. Can I ask you about the sit-talk type? Yes. Because it seems like it's perfectly fair to say it's sedentary work and it's sit-talk type when you're talking about physical disabilities. But mental disabilities relate to something different in kind. And so isn't a more particularized description of the job duties important when you're talking about mental disabilities? In other words, I can sit, talk, and type and be depressed and anxious, but it's much different if I'm a sales job and doing a sales job if I have those mental disabilities than if I'm answering phone calls and directing them to people. In other words, if I have to engage people, it's a different sit-talk type in kind. Correct. And I do agree that sit-talk type or sedentary describes the exertion level, and I don't think there's any dispute about that. The reality is, though, in early 2014, quite frankly, all the way up until the denial or the termination, I should say, in December of 2014, the entire focus by Ms. Castor and her doctors was on her physical inability to perform her job because of her cardiac issues. Once it changed, and once she changed her theory... I understand, but on appeal, it was not, and they changed it, and they were focused on her mental ability to perform her job, and yet Rader's report does not include a fulsome description of the job. It does not detail every aspect, but it is clear that he had, so by the time that he reviewed it and by the time the appeal determination took place, they had the full job description in the file. That was a document that was provided to Dr. Rader, to Dr. Perez, and to Dr. Conrad. Who provided it to them, and where does the record show that they actually received it? Sedgwick provided it to them. Your Honor, I believe that in some of the reports it's specifically listed, and I will look at Dr. Rader's and see if I know he summarizes what the... He just says it's a service representative, if I remember correctly. That sounds like a job title as opposed to a job description. I thought that Dr. Rader actually quoted from the job description. Am I wrong about that? What he said, Your Honor, is that he said job description, so he references a job description for a service representative includes ability to assist customers with orders, billing, and or collection-related issues. In that language that comes directly from... It is, yes. And the other two doctors had the same thing? They did. And actually, Dr. Perez, who was analyzing it from an internal medicine perspective, so the exertion level was important to him, he commented on the fact that the job description really didn't have physical capacity or exertion information. So it's clear that he did analyze and review that as well. Okay, I mixed up the two reports. He says the job description for a service representative did not include physical requirements. So your argument is he's looking at the physical requirements, so that's all he has to do. Correct, and there's no dispute. Again, the appeal letter from Mr. McDonald and his client is completely devoid of any disagreement about the classification or the duties of Ms. Caster's job. Oftentimes we see, Your Honors, we've probably seen other risk cases. He says he didn't have to raise that. under the regs to consider the job duties when you're considering her ailments. That makes sense, right? I mean, why wouldn't you have that duty? Because there was no dispute about it, Your Honor. No dispute about what? He's saying she is not physically and mentally capable of performing the job. To figure out if she is, don't you have to consider the job duties? Well, at the time of the initial termination, there was no contention that she was mentally unable to perform the job. It was only physical. And so the classification, which she agreed to, that she conveyed to Sedgwick, that her job, and again, these are folks that are sitting at a computer and they're summarizing the discussion with her. She relayed and gave a basic outline of what her job is. It's sit, talk type. If you look at the job description, and Judge Rice analyzes this in his opinion, it really encompasses that. Obviously, there's cognitive aspects of the job that are required. But as far as the exertion level, I don't think that it misstates what the exertion level was, and that's what was at issue up until December of 2014. But can she change her theory as to why she is disabled going forward?  She can, Your Honor. However, she still, and I disagree with Mr. McDonald, that it was Sedgwick's obligation to, in the first instance, analyze her job. This plan in this court just decided the Philtoff case in the last six months. And the court there talked about the fact that under this plan, it's the plaintiff's or the claimant's burden of proof to provide objective medical evidence. And I would submit that also includes, especially if there's something unique. Doesn't she provide medical objective evidence? What are you purposefully pointing to there? Well, what I was going to add, Your Honor, is that I submit that she also has to provide information about her occupation if it's something unique or it's not encompassed in the information that she previously provided. Do you think the burden is on the claimant to provide the job duties as opposed to the burden on you representing Sedgwick to ferret it out, or you representing AT&T to provide it, given that you, AT&T, presumably designed what the job description was? I do, Your Honor. I think the cases, and we've cited some in our brief. How can that be if she's taking issue with the job duties, I agree. But if she's not taking issue with the job duties, they are what they are, and they're defined in detail at page 2-6. I can't read your stuff. 1347 of the CF. I'm probably getting the page wrong. But they're provided in detail. So if she's not taking issue with them, why does she have to provide anything? And similarly, my point would be because she wasn't taking issue in her counsel, she was represented by a very good ERISA lawyer during the administrative review process. My client has every reason to believe that there was no dispute or issue taken with the way they classified her job. Nonetheless, they still, because there was this other, she did change, absolutely change her theory of her disability. Is that allowed to do that? Your Honor, I think it, again, depends on the terms of the plan. I think here the reality is she was out of work. She was not, she did not meet the eligibility definitions of the plan any longer, so that the plan could have, but they didn't, could have said your claim for these mental health conditions, you are not eligible. If those developed later, you weren't at work, you weren't a participant of the plan any longer, and therefore you aren't eligible. We can't, that would be a post hoc rationalization at this point, Your Honor. So we can't add that basis. The facts of this case are that she had a number of physical ailments, and that's why the focus might have been on sit-stand type, because she had C. diff and she had a variety of very serious heart conditions. But if you look at all the medical records, starting from that summer of 2014, she also is, her medical records say she is anxious. And so she's had the mental aspect, the mental health aspect all along, but what's happened is the C. diff resolves, she has treatment for various heart problems. Some of the heart problems are continuing, and her focus becomes much more on the mental health issues. So I'm not really sure why we would be concerned about a stoppage and then a startup. And, Your Honor, again, that was, you asked my opinion. I think that could have been how it played out. It was not. They, in fact, simply reviewed it as a new basis for her disability. And the evidence when they looked at it, and I think when you actually look at the treatment records from early 2014 until December of 2014, they don't bear out any kind of significant mental health issues. Dr. Murphy, her primary care physician, he noted in March, normal mood and affect, normal memory, on April 1st states no reports of anxiety or depression. But there are other notes in the record. There are minimal mentions of it, yes. They mention anxiety fairly frequently. I thought in December of 2014, I think it was December 22nd, Murphy says that she needs to take time off. I think it was a combination of the conditions until March of 2015 because of her anxiety, shortness of breath, and something else. I'm trying to. His office visit on December 22nd of 2014, he notes no depression, no sleep disturbance, no fatigue, normal. He does a mini psychological exam each time. That exam was normal. He did note a complaint of anxiety. I think if you look in the context of it, she had these other health conditions, and she was stressed. Sometimes it says stressed. She was stressed about those. But if you look at the actual, he never gave her a global GAF score, so never assessed any kind of depression or anxiety. Correct me if I'm wrong. She does have very low GAF scores later on, right? When she got to Dr. Lunderman in March of 2015, and he saw from the record has from March until June of 2015, he assessed her with a 40 to 50 GAF. Is that considered a low? It is a lower GAF score, Your Honor, yes. So one question that I have, are there other flaws that were discussed in the briefs in the process that Sedgwick used, and in particular using Dr. Conrad at both the initial level and the appeals level? Sure, Your Honor. Yes, Ms. Castor contends that there was a violation of the ERISA, or the Department of Labor regulation that you need to, and what the regulation actually says is the fiduciary shall consult with a healthcare professional who has appropriate training and experience in the field of medicine involved in the medical judgment. So at the time of their appeal submission in June of 2015, Your Honors have read it, the seven and a half pages of that letter are devoted to mental health conditions, and the conclusion and summary are devoted to an allegation or contention that she's disabled from mental health issues. So at that time, the field of medicine involved was psychiatry or mental health issues. They did, Sedgwick did, in fact, engage a new physician at that time, Dr. Rader, to review that. In addition, although I contend they certainly were not required to, but they also then had Dr. Conrad provide an updated report, and they had another doctor that was never used before, Dr. Perez. The regulations do not say that going that extra mile is a violation of the regulation. The regulations in the commentary section at the beginning set forth that these are minimum standards. It would be horrible for claimants, and it wouldn't make any sense to punish a claims administrator and a plan for going above and beyond their obligation. Are you saying that Conrad's second report is irrelevant? I think it's almost exactly the same opinion he rendered before, Your Honor, and that has some significance. There was no rebuttal. There was no, as the question was raised, there was no response from Dr. Goyal, disagreeing with his statement that Ms. Caster could go back to full-time sedentary work. There were no reports from any other cardiologist about her being disabled from cardiovascular issues. So there were no surprises in Dr. Conrad's updated report. So one of the suggestions we made is even, number one, we don't think there was a violation of the regulation. Number two, we think there was substantial compliance. And number three, as the cases say, there would be no basis or no point in remanding it. If the court felt that it didn't meet any of those other three requirements so that Judge Rice's decision is upheld, you could simply disregard that report and we'd get to the same point. What he says is page 683, the post-determination by Goyal that she remained disabled. That was submitted and that was reviewed by Dr. Conrad. He did not find that that... It wasn't that review. That's the review he says is tainted. In other words, that doesn't meet the fresh eyes theory. Go ahead. We also had Dr. Perez, who's an internal medicine specialist, who talked about the cardiovascular issues as well, the increase in the ejection fraction, her overall increase in her medical conditions. And I think when you combine those facts and the fact that, again, there were some medical records submitted, but there's no opinion from Dr. Goyal that she, at the relevant time period in December of 2014, could no longer perform her job. Thank you, Your Honors. Thank you. May it please the Court. I feel lucky to have Eric as a colleague. We've known each other for years and these debates are friendly. A couple of observations. Is sit-talk type in the plan? It's not. Is sit-talk type in the job description? It's not. In the final denial, what do you get? Do you get an advanced analysis of job duties then? No. You don't even get sit-talk type then. The only thing you get is the job title, as Judge Moore, you pointed out. I think we all agree that for the physical requirements, it is sit-talk type. But for the mental requirements, it's something more. And the question is, did they consider something more? And they point to the reports and say, of course we did. We didn't put sit-talk type there. We put that this is what her job includes and they used the general duties. Why isn't that sufficient? That is not sufficient because the plan calls for something different. All the time, we're talking about job duties of your job or some other job in the company. But what are we getting? We're continually getting some sort of distilled, dumbed-down version of what she does. Here's what I want to know. Is it your contention that in order to satisfy the plan, a reviewing doctor would have to go through each one of these lists? No. Handling telephone customer contacts. Yes, you can do that. I have not argued that in my brief. I'm wanting to know what it is. Something more than one sentence. Something that manifests the idea of what actually is going on for what she earns an income for. Technical compliance. Sales. Those kinds. Just give me a basket full of attributes that tell me that you know what she did. Because I think it makes a difference, Judge Larson. It makes a difference, especially when we're talking about stress and cardiac issues and sales. I mean, frankly, the people that are calling AT&T, frankly, are not happy people anyway. But nonetheless, we get into this other point here, and I've got about two minutes. And I am shocked to learn that I have so much power over Sedgwick, and my appeal means so much to them. Next time I will simply ask them, just pay the claim. I disagree with my colleague profoundly on the idea that Ms. Caster has the burden to supply the job description. That's crazy. In fact, it is. Let's concede that you're right. She doesn't have the duty to supply the job description. But wouldn't she have a duty to point out what attributes of this job description she can't perform because of either a physical or a mental disability? Considering that the only time the conversation comes up is when she's home, terribly ill, I'm going to say no. She writes an appeal, right? What's that? So she had an appeal. Months later, yes. At that point in time, she agreed to sit talk type. She was a month into the case. The appeal didn't come for another year almost. But I gather that your opponent's argument pretty much is that when you look at your appeal letter, which I think is the letter that's dated June 18th, 2015, what have you done to notify Sedgwick or AT&T that you think that her situation shows that she can't meet her job duties? At least two things, Judge. Number one, the first three paragraphs, I'm calling into question how 70 can be normal under their standards, adopted by Sedgwick in their file, and how 40 is good enough to put her back to work. There's no explanation ever. I raised that in the first three paragraphs. And I'm also providing inside Dr. Murphy's notes, Dr. Goyle's notes, that highlight the ongoing problems she has after the denial. But with my last six seconds, I disagree profoundly that a code of federal regulations violation did not occur. I think he's wrong about that, and for one very simple reason. He's trying to argue that if you just have a few extra doctors in your appeal, then it's okay. You don't violate the regulation. And I think you do if you do what Sedgwick did here. What they did was they absolutely divided those doctors, didn't they? Look at that final denial at 14, 15, 14, 16, 14, 17, and you're going to see that what you have is reliance on Dr. Conrad from a cardiac perspective. What was it the first time? Dr. Conrad's original report, the only thing he can do is a cardiologist from a cardiac perspective. But Ms. Castor never got fresh eyes from a cardiac perspective, and that's why they violated the rule. The remedy for that violation is clear. The rules say that if you engage in that behavior, you deprive the claimant of my time is up, a full and fair review under the code of federal regulations. The remedy under Vanderklok and the remedy under Moyer v. Metropolitan is clear. Remand, remand, remand. Thank you. Thank you both for your argument. The case will be submitted. Would the clerk call the next case, please?